O'DONNELL, APPELLANT, *v.* GLENN, RESPONDENT.

MINES AND MINERAL LANDS— *Location notice — Verification.* — A location notice of a mining claim is fatally defective which fails to state under oath the date of the location. (Case of *O'Donnell v. Glenn,* 8 Mont. 248, affirmed.)

MAXIMS — *Communis error facit jus — Application.* — In the application of the maxim *communis error facit jus* the existence and effect of the common error is a question of law for the court, and not a question of fact for the jury.

MINES AND MINERAL LANDS — *Verification of location notice — Communis error facit jus.* — Where it appeared that a particular form of verification to notices of location of mining claims had been used in a county in the Territory in not to exceed thirty-three per cent of the notices of location, extending over a period of three years, and which form was not in compliance with law, the maxim *communis error facit jus* does not apply, and it is error to instruct the jury that "the failure or omission to give the date of the location in the verification did not render the location invalid (the error or omission having been one of frequent occurrence at the time)."

COMMUNIS ERROR FACIT JUS. — The court laid down the following principles governing the application of the maxim *communis error facit jus,* subject to the qualification that in every case some of them are applied, while in some cases some of them may be disregarded, each case depending upon its own facts, and holding that the facts in the case at bar were almost wholly in conflict with all of such principles : (1) The common error must be one having some judicial or professional recognition, approved or tolerated by decisions of judges or opinions of lawyers. Or to put the rule less positively, such judicial or professional recognition adds to the law-making force of the common error. We further qualify the rule in this, that common error may possibly have the law-making power, when supported by lay opinion only, provided that other rules may be forcibly applied. (2) Courts will not likely or inconsiderately allow a common error to subvert a rule of law, or abrogate a positive statute. (3) The error must be a universal or very general one. The nearer universal, the more forcibly will it address itself as a law-maker to the approval of courts. (4) The acquiescence in the common error has involved, or there depends upon it, large property interests. (5) The error must be one that the people have relied and acted upon, and have fixed their rights and positions thereby. (6) The longer the error has existed the greater force it has. (7) The error must be clearly proved. (8) The error must be one in the observing, construing, or interpreting law, and not an error in directly disobeying and abrogating that which is law.

*Appeal from Second Judicial District, Silver Bow County.*

The cause was tried before DE WOLFE, J.

Statement of facts, prepared by the judge who delivered the opinion.

This action is the ordinary one between claimants of quartz mining ground, brought to determine the right of possession and the right to proceed in the United States land office to obtain a patent to the premises.

The plaintiff founds his rights upon a location of a claim called the Flap Jack; defendants upon their Argonaut Claim. The respective locations are in geographical conflict.

The validity of the Argonaut location notice was contested upon the trial. The notice and verification thereto is as follows:—

"Notice is hereby given that the undersigned, having complied with the requirements of chapter 6 of title 32 of the Revised Statutes of the United States, and the local laws, rules, and regulations and customs of miners, have located 1500 linear feet on the Argonaut lode (——— acres plain mining ground), situated in Summit Valley Mining District, Deer Lodge County, Territory of Montana, and being more particularly described as follows, to wit: Beginning at a stake at the southeast corner, and running west 1500 feet, thence north 600 feet, thence east 1500 feet, thence south 600 feet to place of beginning. Said lode is bounded on the south by the Silversmith, and southwest by the Goldsmith, and on the east by what is known as the Rooney lode. Above lode runs 900 feet easterly and 600 feet westerly from discovery shaft, and 300 feet on each side.

"Located Dec'r 22, 1880.

Attest:                               "JOHN H. GLENN,
                                      "JOHN HAIL,
                                      "JOHN B. CAMERON.

"TERRITORY OF MONTANA, ⎰
 COUNTY OF DEER LODGE.  ⎱ *ss.*

"J. B. Cameron, first being duly sworn according to law, deposes and says: That we are citizens of the United States, and are the locators of the following described mining premises;

that the description therein contained, as beginning at a stake at the southeast corner, running west 1500 feet, thence north 600 feet, thence east 1500 feet, thence south 600 feet, to the place of beginning, is true; and that the locators, whose names are subscribed thereto, are *bona fide* residents of Montana Territory.

"John B. Cameron.

"Subscribed and sworn to before me this twenty-fourth day of December, 1880.         A. H. Barret, Notary Public.

"Filed for record Dec'r 27, 1880, at 11:30 o'clock, A. M.

"Jas. S. McAndrews, County Recorder."

This case was before this court at the July term, 1888, and the location notice above recited was then held to be fatally defective by reason of the verification omitting to state the date of the location. (8 Mont. 248.)

On the new trial granted by this court, from which trial this appeal is now prosecuted, the District Court admitted this notice in evidence, upon testimony and a theory that were not before this court at the hearing, July, 1888. Defendants introduced testimony for the purpose of showing that large numbers of mining location notices, with verifications of the sort annexed to the above, were used and recorded in the county about the time this notice was filed; and urged that the fault of the verification was common among the people at that period, and that large property interests were involved in the construction of the verification, and invoked the maxim, *communis error facit jus.* The evidence introduced for this purpose, from the records of Deer Lodge County in which the location was made, was as follows:—

At about the time of the filing of the location notice in question, it seems that three forms of verification were in use in Deer Lodge County. For the sake of definition counsel call them the old form, the correct form, and the Glenn form, the latter being the form used in the notice above recited.

In the year 1878, seventy-five per cent of the notices recorded in the county were in the correct form, with twenty-five per cent divided between the old form and the Glenn; the latter being, therefore, some fraction of twenty-five per cent not stated. In February, 1879, 46 out of a total of 50 were in the old and

Glenn forms. In March there were 25 Glenn against 35 of the two others. In April one half were Glenn and old forms. In the two years, 1879 and 1880, there were 914 locations, of which 283 were Glenn, 97 old, and 534 correct form. The Glenn and old together form forty-two per cent of the whole. The Glenn alone is thirty-one per cent of the whole. Leaving out of consideration the old form, and computing the Glenn and correct form, the Glenn is thirty-three per cent of the total. From and after March, 1880, the use of the Glenn form steadily and rapidly decreased. In March the Glenn form was 27 out of a total of 60; in April, 22 out of 100; May, 11 out of 65; June, 7 out of 40; July, 2 out of 30; August, 1 out of 45; September, 2 out of 35; October, 2 out of 25; November, none. December 22d, we meet the notice in controversy, and with that the use of the form disappears from the records. For six months preceding the date of the record of the Argonaut location, the objectionable form was used 14 times in 190 location notices.

This analysis is taken from the brief of appellant, and was admitted by respondent to be correct. The District Court admitted the evidence, and upon the subject gave the following instruction : "The burden of proof is on the defendants to show that the Argonaut was a valid location ; and that in making the same they complied with all that the law requires to make a valid location, as defined to you above [referring to preceding instructions] ; and that such location included within its boundaries the ground in controversy. If the jury believe, from the evidence, that the defendants, or their predecessors in interest, prior to the location made by plaintiff, located the premises in controversy as the Argonaut Claim, and in the affidavit of the location failed to state the date of said location, and to verify the same, but said Argonaut Claim was in all other respects located and recorded as required by law, the court instructs you that the failure or omission to give the date of the location in the verification did not render the location invalid (the error or omission having been one of frequent or common occurrence at the time) ; and if the jury believe that the location of the Argonaut was, in all other respects, regular, and such as the law requires, their verdict should be for the defendants for the possession of the premises in controversy."

The verdict and judgment were for the defendants. Plaintiff appeals from the judgment. Among his exceptions saved is his objection to the admission of the above testimony as to the alleged common error, and the construction of the court in the foregoing instruction, that the alleged error was a common one at the time, and as such common error made the location notice of the Argonaut good for the purposes of the action, notwithstanding that the location notice was intrinsically fatally defective, as held in 8 Mont. 248, cited above. Respondent still insists, upon this hearing, that the location notice and verification were good, notwithstanding the decision of this court in the former appeal. This position is taken, as counsel inform the court, that they may preserve their point, in case an appeal should lie from the present decision of this court.

*William Scallon,* for Appellant.

A common error, or a usage or custom springing from an error, cannot contradict a rule of law, or vary a positive provision of a statute. The maxim that *communis error facit jus* (which is translated by Broom in his Legal Maxims, p. *141, as follows: "Common error sometimes passes current as law"), is sometimes invoked to sustain practices of doubtful correctness, but long continued and universally recognized, or to control the construction or interpretation of a vague statute or rule, but can have no further effect. (Broom's Legal Maxims, pp. *141, *142.) The author cites, among others, the statement of "a learned and distinguished judge," that he "hoped never to hear this rule insisted upon, because it would be to set up a misconception of the law in destruction of the law." (Bishop on Statutory Crimes, § 150, custom.) Custom in this country, he believes, would not "be accepted to the overturning of a positive rule either of the common or statutory law; for with us custom is admitted simply to supplement, not to supersede, the prior law, whether statutory or common." (*Corn Exchange Bank* v. *Nassau Bank,* 91 N. Y. 74.) The court in this case say: "Whatever tends to unsettle the law, and make it *different in different portions of the State,* would lead to mischievous consequences and be against public policy, and so it has been fre-

quently held." The point made in *Corn Exchange Bank* v. *Nassau Bank*, *supra*, that whatever tends to unsettle law and make it different in different portions of the State is against public policy, is peculiarly applicable to the case at bar; for here the proposition is, not that owing to this supposed local error, the statute should be so construed that affidavits like the one in the case at bar should be regarded all over the State, wherever made, and forever, as a sufficient compliance with the statute. (As in the case of *McKeen* v. *Delancy's Lessee*, 5 Cranch, 22, a case relied on by respondents, where a form of acknowledgment long accepted by the courts and bar of Pennsylvania, was for that reason approved by the United States Supreme Court against their own views.) On the contrary, the point sought to be made is, that notwithstanding the statute, within a circumscribed portion of the State, and for a limited period, namely, in Deer Lodge County, and for a year or two, such affidavits should be held sufficient, but that at any other time since then or elsewhere, they may not be. In other words, to temporarily repeal, suspend, or alter the statute for the benefit of a small number of people in Deer Lodge County, is what the court is asked to do. In *McBurney* v. *Berry*, 5 Mont. 300, a case from Jefferson County, decided in January, 1885, a notice of location was held invalid by reason of a defective affidavit; and in that case, as well as in the opinion of the first appeal in the case at bar, the statute was held imperative. But if the contention of the respondents should obtain, nothing would prevent proving local errors in each county in the State, and thereby making the law different in each county. For the definition and requisites of a custom and its effects, see 1 Bouvier's Institutes, page 28, section 121; page 594, section 2206. (An analysis of the figures showing the extent of the custom in the case at bar, taken from the brief of appellant, is found in the statement of facts by the court. — REPORTER.) If it be urged that to reject this notice would perhaps destroy the validity of many claims, we say that there is nothing to show that any number of such claims still rest upon the original locations; and it is but fair to presume that most of them have either been patented or relocated, or that the original locations have been corrected. And within the nine years or more which have followed the disuse of this

form there was certainly time to either patent all such claims, or to correct the original locations. "The law assists those who are vigilant, not those who sleep on their rights." The question whether or not there existed in fact a common error or custom, as claimed, was a question of fact for the jury. The *validity* of the so-called usage was for the court, its *existence and extent* for the jury. (1 Thompson on Trials, § 1058.) In *Hauswirth* v. *Butcher*, 4 Mont. 299, an affidavit such as designated herein, the *old form* was held good. This rule ought not to be extended so as to give effect to each new error which may arise.

*John F. Forbis*, for Respondents.

The appellant mistakes the position of the respondents, when it is asserted that the respondents rely upon a custom or usage, whereby insufficient location notices became sufficient by reason of such custom or usage. There is, as we conceive, a vast difference between the principles of law governing custom and usage, and that applicable to the maxim *communis error facit jus*. The first, according to all authorities, must be immemorial, universal, compulsory, continued, certain, and not contrary to the common or statute law. The other has none of these characteristics, but on the contrary is neither immemorial, universal, compulsory, continued, nor certain, and is contrary to the letter of the law. The maxim clearly indicates that it is not a custom or usage in the legal sense, but is exactly what neither custom nor usage is, an error in construction of law. One which, however, the courts believe it better to overlook than to enforce the strict letter of the law. As we understand the maxim we invoke it is this: The law has prescribed certain formalities, which are mandatory and must be followed. No one individual may disregard the mandate. However, by a common error of construction, the law has been often, but not universally misconstrued in certain localities, and the title to much property has come to depend upon the misconstruction. Under such circumstances the courts, when attention is called to the facts, decide that they, for the general good, will give the same construction to the law that had been commonly given to it by those who had, not judicially but by practice, construed it

before them.   The maxim constitutes rather a rule of construc-
tion of a statute than the establishment of a custom or usage.
The law is not disregarded, but given a construction which the
courts would not give it but for the fact of the erroneous con-
struction generally given it theretofore.   We have found no
definition of what constitutes this common error in all of its
details, but from the authorities discussing the question we think
the following rules may be deduced: 1st.  An error must have
arisen in the construction of statute law.  2d.  The error must
consist in the construction of the formal requirements of the
law; such as the attestation, verification, or acknowledgment of
legal instruments.  3d.  The purpose of the law must not be
overthrown or its spirit violated.  4th.  Vested rights to a large
extent must depend upon maintaining the erroneous construc-
tion.  5th.  The error must be frequent or general, but need
not be universal, and may be confined to a particular locality
or community.  If these are the rules governing the appli-
cation of the maxim, then the case at bar meets each and every
requirement.  In support of our position we cite, *Hauswirth*
v. *Butcher*, 4 Mont. 299; *McKeen* v. *Delancy's Lessee*, 5
Cranch, 22; *Panaud* v. *Jones*, 1 Cal. 488, 499, 500; *In the
Matter of the Will of Warfield*, 22 Cal. 51–71.  If, therefore,
the whole question involves the construction of law (and surely
nothing else is involved), then the whole matter is one for the
consideration of the court and not for the jury.  It is not for
the jury to construe law or to receive information throwing
light upon its construction.  Consequently the evidence was
properly submitted to the court.  It is also objected that the
evidence received was not legal evidence, and consequently the
court erred in receiving it.  The court is not required to seek
legal evidence for its information.  If the court had seen fit to
do so, it might well have investigated the facts, and obtained
information directly from the records, or by secondary or any
other evidence, which would have satisfied the judicial mind.
This the court did in *McKeen* v. *Delancy's Lessee, supra.*  In
that case the Supreme Court of the United States took state-
ments of counsel before the bar, and construed the law contrary
to its letter, because it was necessary to make such a construction
in order to sustain titles to large amounts of property.  In the

case at bar it was almost an impossibility to produce legal evidence of the records of Deer Lodge County. The records themselves could not be produced, and to require certified copies to be introduced in evidence would have been a denial of justice, as the expense would probably involve more than the value in litigation. The court in view of the circumstances resorted to the best information within its reach. This it had a perfect right to do. None of the decisions hold that the error must be universal. We respectfully submit that the verification in this case was sufficient. It is true that the Supreme Court of the Territory held otherwise. But we think the reasoning of the Supreme Court faulty; that the opinion is wrong in principle; and that this court would be justified in overruling that opinion. The laws of Montana do not require the record to state the names of the locators or the date of the location, but only the description with reference to some natural object or permanent monument. It does not require an oath to a declaration giving the names of the locators and the date of location. But it does require a verified declaration, "describing such claim in the manner provided by the laws of the United States." That this claim was described as provided by the laws of the United States is not disputed, and the oath to the declaration gives a correct description of the claim by metes and bounds, and also says that the description contained in the declaration itself is true. It would seem that there could be no question as to the sufficiency of the oath to the declaration, if the law is to be construed as meaning what it says. But the Supreme Court of the Territory in passing upon this oath (*O'Donnell* v. *Glenn*, 8 Mont. 248) seem to seek some opportunity to declare this location notice void, rather than give it a reasonable construction and sustain it. In that opinion the court holds that the notice and oath are sufficient in every respect, except that the oath does not give the date of location.

DE WITT, J.—The sufficiency of the location notice of the Argonaut Claim is no longer an open question in this case. It was decided to be invalid on the former appeal. (8 Mont. 248.) That decision is now the law of this case. The other consideration is whether the common error sought to be proved and

relied upon by defendants was, in fact, a common error, and
whether, as such, it was of a nature to make good, for the pur-
poses of the action, the defective location notice. The District
Court held that both the existence and effect of a common error
of this sort is a question for the court and not the jury. The
matter is one of mixed law and fact. In the application of
the maxim *communis error facit jus*, the inquiry is whether "the
law is made." If the fact of the existence of a common error
is to be submitted to the jury, and the jury finds its existence,
then the court has no province but to complete the maxim and
say, *facit jus*. But that is the very question for a court, that
is to say, "what is the law." The court must say what the "law
has been made," whether by a common error, or by a legis-
lature. We are, therefore, of opinion that the lower court was
correct in holding that both the existence and effect of the
alleged common error was for the court and not for the jury.
To hold otherwise would be to make the jury the judges of the
law. (See *McKeen* v. *Delancy's Lessee*, 5 Cranch, 22, and
cases cited below.)

We will now endeavor to determine whether the court erred in
its decision, that such a common error existed as should be held
to make the law that the controverted location notice was good
for the purposes of the case on trial. The application of the
maxim under consideration, like that of all concrete generali-
zations, is attended with difficulty and danger. A review of the
authorities leads us to the conclusion that each case of the invoca-
tion of the rule must stand largely upon its own facts. In Coke
upon Littleton, we find that the learned author often prefaces
the announcement of a legal principle with the words "it is
commonly said." By these words we understand is meant, "it is
commonly the legal opinion." To the expression cited, Little-
ton adds: "That is, it is the common opinion, and *communis
opinio* is of good authority in law. *A communi observantia non
est recedendum;*" which we may read, "there must not be a de-
parture from a common or general observation or practice." The
annotator to Coke upon Littleton adds, at this point: "Other
rules immediately connected with this are, *communis error facit
jus*, and *res judicata pro veritate habetur*, and *minime mutanda
sunt, quæ certam interpretationem habuerunt.*" The two latter

may, perhaps, be well rendered, "an adjudicated matter shall be deemed to be correct," and "those matters shall be least changed which have attained a certain interpretation." The language of these maxims carries the idea of an observance, an interpretation, a construction, and to some extent, a judicial one at that, as evidenced by the words, *observantia, res judicata,* and *interpretationem.*

Thus we find our maxim under purview at an early day, in company with language tending to the view that the common error that makes the law is an error in the observing, the construing, the interpreting law, and not an error in totally disregarding, and in practice, repealing a positive statute; and furthermore, that the error is general, and not confined to a portion of one class of the inhabitants of one geographical or political division of the jurisdiction, as was the case with the error being considered, which was confined to thirty-three per cent of the prospectors of the county of Deer Lodge, of the Territory of Montana. In the year 1764, the Supreme Court of Pennsylvania say: "These deeds, and this mode of examination of *femmes covert,* on conveying their estates, have generally prevailed in this province from its first settlement, and undergone from time to time the notice of the courts of justice; it would be very mischievous now to overturn them. The maxim *communis error facit jus* cannot operate more properly than in this case." (*Davey* v. *Turner,* 1 Dall. 14.) Here a general practice had received tacit judicial approval for years. The same court, in 1768, apply the maxim to a " constant usage," the individual instance of which having occurred forty-one years prior to the controversy before the court. (*Lloyd* v. *Taylor,* 1 Dall. 17.) The Supreme Court of the United States, in 1809, apply and discuss the doctrine. Says Mr. Chief Justice Marshall: "The first question which presents itself in this case is, was this deed properly proved? Were this act of 1715 now, for the first time, to be construed, the opinion of this court would certainly be that the deed was not regularly proved. A justice of the Supreme Court would not be deemed a justice of the county, and the decision would be that the deed was not properly proved, and therefore not legally recorded. But in construing the statutes of a State on which land titles depend, infinite mischief would

ensue, should this court observe a different rule from that which has long been established in the State; and in this case the court cannot doubt that the courts of Pennsylvania consider a justice of the Supreme Court as within the description of the act. It is of some weight that this deed was acknowledged by the chief justice, who certainly must have been acquainted with the construction given to the act, and that the acknowledgment was taken before another judge of the Supreme Court. It is also recollected that the gentlemen of the bar, who supported the conveyance, spoke positively as to the universal understanding of the State on this point, and that those who controverted the usage on other points did not controvert it on this. But what is decisive with the court is, that the judge who presides in the Circuit Court for the district of Pennsylvania reports to us that this construction was universally received." (*McKeen* v. *Delancy's Lessee,* 5 Cranch, 22.) In this case there was a " universal understanding in the State"; and the learned Chief Justice refers to the judicial and professional construction in the State. In *McFerran* v. *Powers,* 1 Serg. & R. 101, the same question was before the Supreme Court of the State of Pennsylvania, and was decided upon the authority of the case last above cited. And here again, we find the idea of a universal and judicial or professional construction.

In the Supreme Court of the United States, in 1803, in the case of *Stuart* v. *Laird,* 1 Cranch, 309, the court, Patterson, J., says: "To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." This case is another instance of the universal and judicial character of the error. (See, also, *Green* v. *Neal's Lessee,* 6 Peters, 291, which reviews many of the cases.)

The Supreme Court of Massachusetts say, in *Rogers* v. *Goodwin,* 2 Mass. 477: "Of these statutes a practical construction early and generally obtained, that in the power to dispose of lands was included a power to sell and convey the common lands.

Large and valuable estates are held in various parts of the commonwealth, the titles to which depend on this construction. Were the court now to decide that this construction is not to be supported, very great mischief would follow. . . . . We cannot shake a principle which in practice has so long and so extensively prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law. The legal ground on which this provision is now supported is, that long and continued usage furnishes a contemporaneous construction, which must prevail over the mere technical import of the words."

We cite Mr. Justice Blackburn as follows, in *Reg.* v. *Justices of Sussex*, 2 Best & Smith, 664: "I think, also, that there are cases in which a mistaken notion of the law has, no matter why, become so generally accepted, and been so acted upon, as to render it probable that business has been regulated, and the position of parties altered in consequence, and in such cases we may hold that the general acceptation of the mistake has made that law which was originally error. *Communis error facit jus;* but then, I think, that before we act upon this principle, we ought to see it clearly made out that the error has been commonly accepted, and that the nature of the case is such that parties are likely to have acted upon the mistake and so altered their rights and position."

Lord Brougham, chancellor, says, in *Devaynes* v. *Noble,* 2 Russ. & M. 495: "If it be true that even a prevailing error, what is called a common or a universal error, may be said to make the law, this at least may be allowed to be a sound foundation of the doctrine I am referring to, namely, that unless a great and manifest deviation from principle shall have been committed, it may create much further mischief to reverse an individual case by way of correcting a slight error, if that error has been acted upon for a long series of years, than to leave it as it stands; more especially if the opinions of lawyers and the decisions of judges have been ruled by it, and if, upon the analogies of that case, the same principle has been recognized and adopted in other cases connected with and relating to it."

The learned chancellor above calls a common error a universal error, and speaks of the opinions of lawyers and the decisions

of judges being ruled by it. *In the Matter of the Will of War-field,* 22 Cal. 71, the court says: "Courts feel themselves constrained to uphold, where it is possible, contemporaneous interpretation of statutes, under which interpretation rights of property have for many years been acquired." In the case of *Panaud* v. *Jones,* 1 Cal. 498, the court cites with approval a Spanish authority, Escriche's Derecho Español, as follows: "Legitimate custom acquires the force of law, not only when there is no law to the contrary, but, also, when its effect is to abrogate any former law which may be opposed to it, as well as to explain that which is doubtful. Hence it is said, that there may be a custom without law, in opposition to law, and according to law."

Counsel for respondents has urged this opinion in his argument. We hesitate to adopt the views therein contained, however, to the extent that a common error can have the effect to abrogate a positive statute, except under most extraordinary circumstances, of which we now have no knowledge. The California decision was made in the earliest history of the jurisprudence of that State, when it had just fallen heir to much that was Spanish, and along with the rest, perhaps, some customs that were not so valuable as other portions of the inheritance. We have reviewed some of the leading cases in which the maxim under consideration has been discussed and applied, with the view of discovering what the current opinion would be as to the facts in the case at bar. (See, also, the cases cited in the foregoing authorities; and also Broom's Legal Maxims, p. *141; *Corn Exchange Bank* v. *Nassau Bank,* 91 N. Y. 74; *Hazard* v. *Martin,* 2 Vt. 77.)

It is not possible to deduce from the authorities inflexible rules governing the practical scope of the maxim, *communis error facit jus.* The decisions tend, however, toward a few general principles, each of which principles has at some time been invoked in some case, but not all of them, perhaps, in the same case. In every case we find some of them applied, while in some cases some of them may be disregarded. We cannot lay down rules, any one of which would be decisive of every case. But we state the following principles, with the suggestion that if an individual case fell within the purview of all of them,

there would be no difficulty with the maxim, and that in proportion as the facts of a case depart from the principles announced, the difficulty of application is increased. Every case depends upon its own facts. The rules as we conceive them to be, rules flexible in their nature, and subject to the qualifications above suggested, are:—

1. The common error must be one having some judicial or professional recognition, approved or tolerated by decisions of judges or opinions of lawyers, or to put the rule less positively, such judicial or professional recognition adds to the law-making force of the common error. We further qualify the rule, in this, that common error may possibly have the law-making power, when supported by lay opinion only, provided that other rules may be forcibly applied.

2. Courts will not lightly or inconsiderately allow a common error to subvert a rule of law or abrogate a positive statute.

3. The error must be a universal or very general one. The nearer universal, the more forcibly will it address itself, as a law-maker, to the approval of courts.

4. The acquiescence in the common error has involved, or there depends upon it large property interests.

5. The error must be one that people have relied and acted upon, and have fixed their rights and positions thereby.

6. The longer the error has existed the greater force it has.

7. The error must be clearly proved.

8. The error must be one in the observing, construing, or interpreting law, and not an error in directly disobeying and abrogating that which is law.

We have called the above suggestions "rules"; but the word "rules" must be received with the limitations above laid down. If the facts in the case at bar met the requirements of all these rules, or if they fell fairly within them, we should affirm the judgment below. But let us examine the facts in the order in which we have stated the rules.

1. The alleged common error in the location notice in question never received approval or toleration by judicial decision or legal opinion. The form of verification was adopted simply by a few prospectors in a part of the Territory, without any assurance from any source that it was correct.

2. The United States and territorial laws as to the requirements of a location notice, as construed in 8 Mont. 248, are peremptory. We hesitate to admit that thirty-three per cent of the mining locators of one county of a vast Territory can, by their own unauthorized practice, abrogate, repeal, and nullify a positive law.

3. So far from the error being general or universal among the people, it was limited to a very small number.

4. It is not shown that large property interests depend upon the upholding of this location notice. Only 283 of these notices are found, and these all in two years. This was ten years ago. In the history of mining prospecting, ten years will see the valuable mines patented and the others abandoned or relocated. They are, in either instance, beyond the necessity of relying upon the defective location notice.

5. It does not appear that any considerable number of persons have relied upon, or sought to fix their rights upon, the alleged common error.

6. The error existed but a short time. It attained its height months before the location of defendants. From March, 1880, it rapidly waned into desuetude, and disappeared with the defendants' location December 22d.

7. The error was clearly enough proved, so far as it went.

8. The error did not consist in any effort to observe, construe, or interpret the law of Congress or the Territory. It was rather a direct disobedience of those laws. To construe or interpret a statute is to read it for the purpose of ascertaining its meaning and effect. He cannot be said to construe or interpret who clearly disregards the law. That is not construing. It is refusing to do so. It is defying the law.

We arrive at the opinion that the facts in the case at bar are almost wholly in conflict with all the principles governing the application of *communis error facit jus.*

The District Court erred in instruction No. 3, recited above, upon the subject of common error. The action of the court in this matter of the alleged common error was objected to, and exception saved in other manner as well as in the instruction referred to.

The judgment is reversed, and the case remanded for a new trial.

BLAKE, C. J., and HARWOOD, J., concur.